TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

September 6, 2017

Nathan P. Wolf, Esq.
Chad Wolf, Esq.
Law Office of Nathan P. Wolf, LLC
673 Morris Avenue
Springfield, New Jersey 07081

Thomas Quirico, Esq.[1]
74 Central Avenue
Hackensack, New Jersey 07601

  Re:  <u>John Benedetto v. Little Ferry Borough</u>
     Docket Nos. 004385-2006, 010521-2009, 004065-2010,
           009317-2011 and 006900-2014

Dear Mr. Wolf and Mr. Quirico:

  This letter constitutes the court's opinion following trial of local property tax appeals filed by plaintiff, John Benedetto ("plaintiff"). Plaintiff challenges the 2006, 2009, 2010, 2011, and 2014 tax year assessments on the improved property located in the Borough of Little Ferry, County of Bergen and State of New Jersey.

  For the reasons stated more fully below, the court reduces the 2006, 2009, 2010, 2011, and 2014 tax year assessments.

---

[1] Joseph G. Monaghan, Esq. represented the Borough of Little Ferry at trial. Substitutions of Attorney were thereafter filed with the court by Thomas Quirico, Esq. on behalf of Little Ferry Borough.

## I. Procedural History and Findings of Fact

Plaintiff is the owner of the real property and improvements located at 100 Riser Road, Little Ferry, New Jersey. The property is identified on the tax map of the Borough of Little Ferry as Block 71.01, Lot 3 (the "subject property"). For the 2006, 2009, 2010, 2011, and 2014 tax years, the subject property was assessed as follows:

Land:          $1,200,000
Improvement: $2,848,900
Total:          $4,048,900

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Little Ferry Borough ("defendant") is 113.5% for the 2006 tax year, 91.96% for the 2009 tax year, 97.13% for the 2010 tax year, 91.31% for the 2011 tax year, and 98.53% or the 2014 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the assessment, the implied equalized value of the subject property is $4,048,900 for the 2006 tax year, $4,402,892.50 for the 2009 tax year, $4,168,537 for the 2010 tax year, $4,434,235 for the 2011 tax year, and $4,109,306.80 for the 2014 tax year.

The site is an irregularly-shaped, triangular 1.8 acre lot, containing approximately 305 feet of frontage along Riser Road. The site is improved with a one-story masonry and steel frame industrial warehouse building constructed in approximately the mid-1980's. The building is irregularly shaped, attempting to maximize lot coverage, containing a side with an approximate 45° degree angle, and seven 90° degree angles. The building contains a ground floor with 37,400 square feet of warehouse area, plus 5,000 square feet of unfinished mezzanine area, four loading docks, and one drive-in door.[2] Included in the 37,400 square feet of warehouse area is 5,000 square

---

[2] Conflicting testimony was initially presented to the court regarding the subject property's building size. During direct examination, plaintiff's appraiser testified that the ground floor of the building contained 37,000 square feet of warehouse area (inclusive of 5,000 square feet of finished office area), plus 5,000 square feet of unfinished mezzanine, based on his review of architectural renderings, discussions with the subject property's real estate

feet of supportive finished office area (located directly beneath the unfinished mezzanine area). The interior of the building, including the warehouse area, office area, and mezzanine is segregated into two separate tenant units, divided by a fire-rated wall. Unit 1 contains approximately 15,700 square feet of warehouse (including 2,500 square feet of finished office area), plus 2,500 square feet of unfinished mezzanine, with private access to two loading docks. Unit 2 contains approximately 21,700 square feet of warehouse (including 2,500 square feet of finished office area), plus 2,500 square feet of unfinished mezzanine, with private access to two loading docks. The mezzanine areas are only accessible from open stairways located within each warehouse unit. One of the mezzanine areas is also accessible from an elevated pass-through carved into the masonry wall. The building has an overall height of 26 feet with an interior ceiling height of 24 feet. Due to the unusual lot configuration and building footprint, tractor-trailers must access the loading docks by backing onto the subject property from Riser Road.

The warehouses are heated by "gas fired package units" suspended from the ceiling. The finished office areas are centrally heated and cooled. One of the warehouse areas is also centrally cooled. The subject property is serviced by public and private utilities including electric, natural gas, water, and sewer.

The recent leasing history of the subject property disclosed that unit one was leased to Dassault Falcon Jet Corp. from July 1, 2003 to June 30, 2008, at an annual rental rate of $117,000, or $7.55 per square foot, net. Upon expiration of the lease term, Dassault Falcon Jet Corp. vacated

---

broker, and the use of an on-line building square footage calculator. Conversely, defendant's expert testified during direct examination that the ground floor of the building contained 39,975 square feet of warehouse area (inclusive of 4,800 square feet of finished office area), plus 3,000 square feet of usable unfinished mezzanine. Defendant's appraiser excluded from his computation approximately 1,800 square feet of mezzanine area he deemed unusable due to accessibility issues. Thereafter, during trial, the parties stipulated that the ground floor of the building contained 37,400 square feet, however, the parties could not agree on the size of the finished office and mezzanine area. The court finds plaintiff's appraiser's testimony regarding the size of the finished office and unfinished mezzanine areas to be more credible.

unit one. Thereafter, on or about October 1, 2009, unit one was leased to Spirit Tex, LLC for a term of three years with a three year option, at an annual rental rate of $72,924.87 or approximately $4.70 per square foot, net. According to plaintiff's appraiser, Spirit Tex paid their annual base rent, but did not pay their common area charges. In or about June 2012, Spirit Tex modified their lease, agreeing to pay gross rent of $7,000 per month, from June 2012 to May 2014. In or about May 2014, Spirit Tex vacated unit one. On July 1, 2014, Castillo Distributors entered into a five-year lease agreement for unit one at an initial annual rental rate of $83,768.64, or approximately $5.40 per square foot, net. The Castillo Distributors lease contains a rent step-up from January 1, 2017 to June 30, 2019, increasing the annual rent to $89,768.64, or approximately $5.79 per square foot, net.

Midway Aircraft Instrument Corporation ("Midway") was a tenant in the subject property from 1987 to 2013. In 2007, Midway entered into a lease renewal for unit two for the period January 1, 2008 to December 31, 2012. From January 1, 2008 to December 31, 2010, Midway paid annual rent of $200,490.00, or approximately $9.33 per square foot, net. The lease provided that from January 1, 2011 to December 31, 2012, the annual rent would increase to $204,180.00, or approximately $9.50 per square foot, net. Midway vacated unit two in May 2013. Thereafter, Otto Tile leased unit two for the period from September 1, 2013 to October 30, 2018, at an initial annual rental rate of $129,030.00, or approximately $6.01 per square foot, net. The lease provides for an annual 4.5% rent step-up during the first five years of the lease term to a peak rent of $153,725.00 annually, or approximately $7.15 per square foot, net. The Otto Tile lease includes two months free rent, common area maintenance charges, and real estate taxes.

In addition, an area of the building's roof is leased to Omnipoint Communications, Inc., for maintenance of cellular communications devices/antenna, under a lease dated October 1, 2001, at an annual rental rate of $18,000.00.

The subject property is located in an industrial area of Little Ferry Borough abutting Teterboro Airport.[3] The property is located in a neighborhood consisting of mixed office, commercial, and industrial uses. The property is located within the I-R Restricted Industrial District, which permits light industrial manufacturing, assembling, packaging, processing, warehousing, and wholesale activities. The subject property does not conform with the current bulk zoning requirements of the I-R Restricted Industrial District, and therefore is considered a pre-existing legal non-conforming use.

At trial, plaintiff and defendant each offered testimony from a State of New Jersey certified general real estate appraiser, who the court accepted, without objection, as experts in the property valuation field. Each appraiser prepared an appraisal report expressing an opinion of the true value of the subject property as of the October 1, 2005, October 1, 2008, October 1, 2009, October 1, 2010, and October 1, 2013 valuation dates. The appraisers utilized both the income capitalization and sales comparison approaches to value the subject property.

The appraisers offered their opinions that the subject property had a true market value as follows:

| Valuation date | Plaintiff's appraiser | Defendant's appraiser |
|---|---|---|
| October 1, 2005 | $2,850,000 | $4,050,000 |
| October 1, 2008 | $2,900,000 | $3,900,000 |
| October 1, 2009 | $2,995,000 | $3,645,000 |

---

[3] The Teterboro Airport is recognized as the "oldest operating airport in the New York and New Jersey metropolitan area." The Port Authority of New York and New Jersey owns and operates the Teterboro Airport terminal, which serves as a corporate air facility and air express terminal, removing smaller aircraft and congestion from the Port Authority's commercial airports. See http://www.panynj.gov/airports/teb-about.html.

| October 1, 2010 | $2,695,000 | $3,900,000 |
| October 1, 2013 | $2,710,000 | $4,250,000 |

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness. . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v.

City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)). "Only after the presumption is overcome with sufficient evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of plaintiff's proofs, defendant moved to dismiss these matters under R. 4:37-2(b), arguing that plaintiff's expert's opinion was a net opinion and therefore, plaintiff failed to overcome the presumption of validity. The court denied defendant's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., supra, 100 N.J. at 413).

b. Highest and Best Use

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v.

7

Shrewsbury Bor., 2 N.J. Tax 541, 551 (Tax 1981).  An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992).  See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).  "For local property tax assessment purposes, property must be valued at its highest and best use."  Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000).  Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process."  Ford Motor Co., supra, 10 N.J. Tax at 161.

> The phrase highest and best use is defined as follows:
>
> > The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
> >
> > [Appraisal Institute, The Dictionary of Real Estate Appraisal (5th ed. 2010).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive."  Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).  See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, after consideration of the highest and best use criteria, both plaintiff's appraiser and defendant's appraiser concluded that the highest and best use of the subject property, as vacant, is

for industrial development in accordance with the I-R Restricted Industrial zoning regulations. Moreover, after giving consideration to all legally permitted, physically possible, financially feasible, and maximally productive alternate uses, both plaintiff's appraiser and defendant's appraiser concluded that the highest and best use of the subject property, as improved, was the existing industrial use of the subject property as a warehouse.

     c.  Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Township, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Township, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co., supra, 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Township, 4 N.J. Tax 51 (Tax 1982).

9

1. Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). The income capitalization approach is "based on the principle of anticipation, which states that value is created by the expectation of benefits to be derived in the future. In other words, the value of an apartment property reflects what a prudent purchaser-investor would pay for the present worth of an anticipated annual income stream and the reversionary benefit to be realized at the end of the anticipated holding period." Appraisal Institute, The Valuation of Apartment Properties, 97 (2nd ed. 2008). Thus, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value. As Judge Hopkins succinctly stated, in valuing a property using the income capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Bor., 1 N.J. Tax 373, 377 (Tax 1980).]

Thus, the first and often most critical "step in applying the income approach is to accurately forecast the future income and expenses associated with ownership of the property." The Valuation of Apartment Properties, supra, at 97. Forecasting a property's gross rental income requires an

10

appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270; see also New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963).

Here, both plaintiff's appraiser and defendant's appraiser valued the subject property under the income capitalization approach and placed the greatest degree of weight on this approach because the subject property was income-producing as of each valuation date involved herein.

    a.   Market Rent

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, supra, at 121-22. The market rent ascribed to a property under the income approach may differ substantially from the "contract rent," or actual rent collected by the owner of the property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

In conducting their analysis and approaches to value, both plaintiff's appraiser and defendant's appraiser first identified the subject property's market area, which they both defined as the Northern New Jersey industrial warehouse market, and more specifically the Meadowlands industrial warehouse market, and Teterboro Airport industrial warehouse sub-market.

Plaintiff's appraiser identified twenty warehouse leases and defendant's appraiser identified twenty-three warehouse leases they considered reflective of the market rent as of the valuation dates. All of the leases selected by plaintiff's and defendant's appraisers were triple net

leases, where in addition to the base rent, the tenant is responsible for a percentage of common charges and real estate taxes.

### 1. Adjustments

Adjustments must have a foundation obtained from market-derived sources or objective data and not be based on subjective observations and/or personal experience. An appraiser's adjustments "must have a foundation obtained from the market. . ." Greenblatt, supra, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Ibid. When an expert "offers an opinion without providing specific underlying reasons. . . he ceases to be an aid to the trier of fact." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), certif. denied, 145 N.J. 374 (1996)). The expert is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid. When an expert's opinion lacks a reliable foundation, supported by facts and objective market data, "the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). Thus, if an expert does not provide a sufficient explanation of the basis of his adjustments, "the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Here, plaintiff's appraiser applied adjustments to the comparable rentals to account for perceived differences in: market conditions/time (ranging from 0% to 5%); location (ranging from 0% to 2.5%); size (ranging from 0% to 5%); physical attributes/ceiling height (ranging from 0% to 5%); and age/condition (ranging from 0% to 10%).

Similarly, defendant's appraiser applied adjustments to the comparable rentals to account for perceived differences in: size (ranging from 0% to 7.5%); ceiling height (ranging from 0% to 5%); and supportive office area (ranging from 0% to 7.5%).

a. Size

Both plaintiff's appraiser and defendant's appraiser expressed that an inverse relationship exists between leased area and rental value. The smaller a leased area, the higher the rental value correspondingly, the larger the leased area, the lower the rental value. However, in fixing the parameters that defined their size adjustments, plaintiff's and defendant's appraisers adopted very different approaches.

Plaintiff's appraiser averaged the leased area of the two rental units on the subject property, determining an average leased area of 18,500 square feet. Thus, the leased area of plaintiff's appraiser's comparable rentals ranged from 5,000 to 32,000 square feet. In plaintiff's appraiser's opinion, a downward adjustment of 2.50% was warranted to each comparable rental for each 5,000 square feet of leased area below 15,000 square feet. Plaintiff's appraiser further opined that a 5% upward adjustment was warranted to comparable rentals containing approximately 30,000 square feet of leased area.

Conversely, defendant's appraiser compared and contrasted the entire leased area of the subject property, or 37,400 square feet, to his comparable rentals. Defendant's appraiser explained that he reviewed twenty leases to discern that a difference in rental rate of 7.49% existed between leased areas greater than, and less than 100,000 square feet. Thus, defendant's appraiser made an upward adjustment for size of 7.5% to those comparable rentals having a leased area greater than 100,000 square feet. However, defendant's appraiser made no size adjustment to account for differences in leased area for comparable rentals containing less than 100,000 square feet. The

13

leased area of defendant's appraiser's comparable rentals ranged from 12,000 to 197,445 square feet.

Here, both plaintiff's appraiser and defendant's appraiser opined that the highest and best use of the subject property was its continuation as a multi-tenanted industrial warehouse building. Credible testimony was presented by both appraisers that a firewall exists in the subject property, creating two separate and distinct rental units. Moreover, evidence was offered during trial revealing that as of each valuation date, the subject property was leased to two different tenants. No evidence was proffered by either defendant's appraiser, nor plaintiff's appraiser that the subject property was offered for lease to a single tenant, during any of the tax years at issue. Furthermore, no evidence was presented by either appraiser to address what physical modifications would be required to the interior of the subject property to enable it to be utilized by a single tenant. Therefore, the court finds the parameters of comparison used by plaintiff's appraiser - i.e., selecting and contrasting the subject property to comparable rentals based on the average of the leased area of the two rental units - to be more accurate and representative of the market. The court does not find the parameters employed by defendant's appraiser, making size adjustments for leased areas only in excess of 100,000 square feet, to be reasonable. These parameters resulted in defendant's appraiser making no adjustment for size to comparable rentals containing between 12,000 and 95,542 square feet.

In general, the court accepts the size adjustments employed by plaintiff's appraiser as reasonable, and finds them supported by the evidence and comparable rental data presented. However, the court concludes that modifications to plaintiff's appraiser's size adjustments are necessary. Plaintiff's appraiser made no size adjustments to his comparable rentals 17, 18, and 20, although they range from 24,000 to 24,433 square feet and thus, are approximately 23% larger

14

than the average size of the units on the subject property. Plaintiff's appraiser posited that the range of competitive and comparable rentals to the subject property was between 15,000 and 25,000 square feet. Therefore, he deemed no adjustment necessary to comparable rentals meeting those parameters. However, based on the evidence presented, the court does not find plaintiff's appraiser's rationale for adjusting a comparable rental containing 25,000 square feet, but failing to adjust a comparable rental containing 24,433 square feet reasonable. Accordingly, the court finds that an upward 5% size adjustment is warranted to plaintiff's appraiser's comparable rentals 17, 18, and 20.

Additionally, it is necessary for the court to account for the size adjustments required to defendant's appraiser's comparable rentals containing a leased area exceeding 30,000 square feet. To discern the approximate size adjustments required, the court has compared and contrasted defendant's comparable rentals 11, 12, 13, and 14; four leases entered into within five months of one another. Such comparison has revealed that rental 11 and 12, properties within the 15,000 to 25,000 square foot range, were renting for substantially similar values per square foot. In addition, comparable rentals 13 and 14, properties within the 46,000 to 65,000 square foot range were renting for substantially similar values per square foot. However, due to the inverse relationship that exists between leased area and rental value, comparable rentals 13 and 14 were leasing for values approximately 15% to 18% below those of rentals 11 and 12. Thus, accepting plaintiff's appraiser's opinion, that a leased area containing 25,000 to 30,000 square feet requires a 5% upward size adjustment, the court will adjust defendant's appraiser's comparable rentals containing: (i) 31,000 to 45,000 square feet, an additional 4% upward; and (ii) 46,000 to 65,000 square feet, an additional 4% upward.

These parameters are further confirmed by the court's analysis of defendant's comparable rentals 16 and 18. These properties are located within the same municipality and were leased within two months of one another. Comparable rental 16 is approximately 69,000 square feet and comparable rental 18 is approximately 35,000 square feet. Comparable rental 16 leased for approximately 4% less than comparable rental 18, suggesting that an upward rental adjustment of 4% between these two parameters of comparison is reasonable.

Moreover, the elements of comparison to be "considered in [a comparable] rental analysis are. . . physical characteristics - size, height, interior finish, functional layout, site amenities, etc." Appraisal Institute, The Appraisal of Real Estate, 466 (14th ed. 2013). In selecting appropriate elements of comparison, an appraiser must focus on those similarities and differences that affect value and account for those differences by making reasonable adjustments. By definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Township, 9 N.J. Tax 66, 72 (Tax 1987). However, it is pivotal that an appraiser establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, supra, at 390. Here, the court does not find that leased areas containing 3½ times or more the average size of the units in the subject property are comparable to and thus, competitive in the marketplace with the subject property. Accordingly, the court must reject defendant's appraiser's comparable rentals containing leased areas in excess of 65,000 square feet.

b.  Ceiling height

Both plaintiff's appraiser and defendant's appraiser identified that certain physical attributes of a warehouse, - specifically its ceiling height - account for marked differences in rental value.  In the opinion of both plaintiff's appraiser and defendant's appraiser, warehouse ceiling heights less than 20 feet represent substandard conditions, warranting a 5% upward adjustment.

This court has recognized that "[n]ormally in a warehouse, manufacturing/industrial plant, high ceilings up to a certain height are desirable." Congoleum Corp. v. Hamilton Twp., 7 N.J. Tax 436, 455 (Tax 1985). See also 90 Riverdale, L.L.C. v. Borough of Riverdale, 27 N.J. Tax 328, 342 (Tax 2013).  "[F]or optimal functional utility, warehouses should have adequate access, open areas, ceiling height, floor load capacity, humidity and temperature controls, shipping and receiving facilities, fire protection, and protection from the elements." The Appraisal of Real Estate, supra, at 266.  Although smaller warehouses "can be operated with a clear [ceiling height] spans of 15 to 20 feet. . . higher ceilings may be standard in the market." Ibid. at 267.  The clear ceiling height span in a warehouse should be "[a]nywhere from 21 to 35 feet." Ibid. at 266.  "Generally, a clear height of 28½ feet is ideal.  Clear heights less than 20 feet represent significant functional obsolescence, and those less than 15 feet represent severe obsolescence." Douglas McNight, "A practical guide to Evaluating the Functional Utility of Warehouses," The Appraisal Journal, Vol. LXVII, No. 1 (January 1999), 29-36, at 30, cited in The Appraisal of Real Estate, 268, n. 8 (13th ed. 2008), cited in 90 Riverdale, L.L.C., supra, 27 N.J. Tax 333, n. 6.

Here however, neither plaintiff's appraiser nor defendant's appraiser offered meaningful surveys or market data in support of their ceiling height adjustment parameters.  Cross-examination revealed plaintiff's appraiser's view that the ceiling height adjustment "is a market phenomenon that I observed, and I have considered my knowledge of the difference in construction

17

costs and differences in height, I have considered that, and to the extent that cost push[es] value somewhat, there are those differences." However, no analysis of the cost to construct an industrial warehouse was set forth in plaintiff's appraisal report, and only limited testimony was offered by plaintiff's appraiser on the cost to construct a warehouse. Plaintiff's appraiser's testimony offered little insight into the additional costs which would be borne to construct a warehouse with a 20 foot ceiling height versus with a 14 or 15 foot ceiling height, and more importantly, how those costs would translate into market value. Moreover, no evidence was offered by either appraiser disclosing that a warehouse with an interior ceiling height of 20 feet will lease for 5% more than a similarly situated and competitively priced warehouse having a ceiling height of 18 feet.

Nonetheless, the court acknowledges that both plaintiff's appraiser and defendant's appraiser have concluded that a 5% upward adjustment is warranted to industrial warehouses containing a ceiling height less than 20 feet. Moreover, this court has previously recognized that ceiling heights less than 20 feet "represent significant functional obsolescence, and those less than 15 feet represent severe obsolescence." 90 Riverdale, L.L.C., supra, 27 N.J. Tax 333, n. 6. Therefore, the court will accept plaintiff's and defendant's appraisers' 5% upward ceiling height adjustment for each comparable warehouse rental containing a ceiling height between 15 to 19 feet. However, the court will not accept as comparable and competitive to the subject property any industrial warehouse containing a ceiling height of 14 feet or less.

c. Supportive office

Defendant's appraiser advanced that the Meadowlands industrial warehouse market and Teterboro Airport industrial warehouse submarket demand supportive office space of between 5% to 20%. Thus, he offered that a supportive office adjustment of 7.5% was necessary to each comparable rental containing supportive office area greater than 20% of the leased area. To

18

substantiate his supportive office adjustment, defendant's appraiser performed a paired analysis of two groupings of the comparable rentals: (i) rentals 5, 7, and 10; and (ii) rentals 6, 8, and 9. Based on his categorization and analysis of those groupings, defendant's appraiser concluded that market data supported increased rent, between 3.05% and 13.14%, for supportive office space greater than 20% of the leased area. However, the court's review of the data does not necessarily support such paired analysis and conclusion. Defendant's comparable rental 10 was entered into seventeen months after comparable rental 5, and thirteen months after comparable rental 7, however defendant's appraiser failed to account for, or satisfactorily explain such time disparity. Comparing defendant's comparable rental 5 to comparable rental 7, the court observes that the building age, leased area, ceiling height, location, and loading docks were all substantially similar. Comparable rental 5 contained 13% supportive office space in contrast to comparable rental 7 which contained 22% office space. This difference in supportive office space represents a difference of 3.15%. Comparing defendant's comparable rental 9 to comparable rentals 6 and 8, the court observes that the leased area of comparable rental 9 is approximately fifty percent less than the leased area of rental 6, and forty percent less than the leased area of rental 8. However, defendant's appraiser failed to account for, or explain these material differences in leased area. More importantly, comparable rental 6 was an amendment and renewal of a May 1, 2002 lease agreement. Defendant's appraiser did not consider the impact the lease renewal played on fixing the lease price. Thus, the court concludes that there is inadequate support in the record for defendant's appraiser's conclusion that a 7.5% adjustment is warranted for supportive office space greater than 20%. Instead, the court will accept a 3% adjustment for supportive office space greater than 20% of the leased area, as supported by the record.

d. <u>Location</u>

In general, plaintiff's and defendant's appraisers' comparable rentals were located within the Meadowlands industrial warehouse market and Teterboro Airport industrial warehouse submarket, and thus required no location adjustments.

However, plaintiff's comparable rental 16 was located in Leonia, outside of the Meadowlands industrial warehouse market and Teterboro Airport industrial warehouse submarket. Plaintiff's appraiser adjusted comparable rental 16 by 2.5%, describing it as "an inferior industrial area." However, neither plaintiff's appraiser's report nor testimony disclosed any objective market data in support of this location adjustment, other than the appraiser's professional experience and observations. Without the "why and wherefore" in support of his location adjustment, the court is unable to discern its accuracy. Thus, the court must reject plaintiff's appraiser's location adjustment, and comparable rental 16 as evidence of market rent.

e. <u>Market Condition/Time</u>

In plaintiff's appraiser's opinion, a downward market condition/time adjustment of 5% was required to comparable rentals 10, 11, and 12 to account for "rapidly declining" rental rates between the lease dates and the October 1, 2009 valuation date. The court observes that comparable rental 10 was entered into 8 months prior to the October 1, 2009 valuation date; comparable rental 11 was entered into 7 months prior to the October 1, 2009 valuation date; and comparable rental 12 was entered into 4½ months prior to the October 1, 2009 valuation date. Although the court acknowledges that during 2009 the country was experiencing an economic recession, plaintiff's appraiser offered no objective market data or surveys to support his 5% adjustment. Moreover, the comparable rental information supplied by plaintiff's appraiser, as of the October 1, 2009 valuation date, is not conducive for performing a paired analysis, due to

variances in building size, age, and physical attributes. Accordingly, the court must reject plaintiff's appraiser's market condition/time adjustments.

f. Age/Condition

In plaintiff's appraiser's opinion, the subject property, having been constructed in the mid-1980's, was more modern than the comparable rentals, requiring a 10% upward age/condition adjustment. The court accepts plaintiff's appraiser's age/condition adjustment of 10% as reasonable.

The range, per square foot, of plaintiff's appraiser's unadjusted rents and adjusted rents for the twenty warehouse leases are set forth as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Unadjusted Rents | $4.50 - $7.54 | $5.50 - $7.95 | $6.00 - $7.95 | $5.00 - $7.70 | $5.00 - $6.46 |
| Adjusted rents | $4.95 - $8.57 | $6.33 - $8.38 | $6.75 - $8.47 | $6.00 - $7.32 | $5.00 - $6.78 |

Ultimately, plaintiff's appraiser concluded a market rent, per square foot, for the warehouse area as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market rent | $7.50 | $7.30 | $8.00 | $6.70 | $6.00 |

In addition, plaintiff's appraiser concluded a market rent, per square foot, for the unfinished mezzanine area as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market rent | $3.75 | $3.65 | $4.00 | $3.35 | $3.00 |

Plaintiff's appraiser's conclusion of market rent for the unfinished mezzanine area was computed by dividing his concluded market rent for the warehouse area by 50%.

The range, per square foot, of defendant's appraiser's unadjusted rents and adjusted rents for the twenty-three warehouse leases are set forth as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Unadjusted Rents | $6.88 - $8.12 | $7.45 - $8.90 | $6.77 - $8.43 | $7.26 - $8.51 | $7.91 - $8.26 |
| Adjusted rents | $7.40 - $8.56 | $7.82 - $8.68 | $6.77 - $8.43 | $7.62 - $8.51 | $8.26 - $8.73 |

Ultimately, defendant's appraiser concluded a market rent, per square foot, for the warehouse area as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market rent | $8.00 | $8.00 | $7.75 | $8.25 | $8.50 |

2. Conclusion

"The trial judge as the factfinder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt 'so much of it as appears sound, reject all of it, or adopt all of it.'" Riorano, Inc. v. Weymouth Township, 4 N.J. Tax 550, 564 (Tax 1982) (quoting State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932)). Our Supreme Court long ago recognized that "[t]he Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Township of Wall, 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle, 3 N.J. Tax 345, 353 (Tax 1981). Thus, the court is faced with the responsibility of applying its own judgment to the evidence presented to determine the true market value of the subject property.

Mindful of these principles, the court engaged in an analysis of the appraisal reports and testimony offered by plaintiff's and defendant's appraisers, comparing and contrasting their warehouse market rents, including those adjustments accepted by the court. After considering all of the evidence presented, the court concludes the following market rents for the subject property:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market rent | $8.50 | $7.60 | $7.75 | $7.60 | $6.15 |

The primary reason for the court's conclusion stems from the court's analysis of plaintiff's and defendant's appraisers' comparable rentals, including the testimony offered thereon by each appraiser.

a. October 1, 2005 valuation date

Plaintiff's appraiser's comparable rentals 1 and 3 were most similar in size and age to the subject property. In addition, comparable rentals 1 and 3 were executed within six months of the October 1, 2005 valuation date. Conversely, plaintiff's comparable rental 2 is approximately 40 years older than the subject property, and comparable rental 4 is approximately 25 years older. Moreover, the court observes that plaintiff's comparable rental 4 was entered into four months following the October 1, 2005 valuation date. Thus, the court concludes that plaintiff's appraiser's comparable rentals 1 and 3 are more accurate evidence of market rent. After adjustments, plaintiff's appraiser concluded an adjusted market rental rate of $8.28 for comparable rental 1, and an adjusted market rental rate of $8.57 for comparable rental 3.

Defendant's appraiser's comparable rental 1 bears a similar interior ceiling height, and required no adjustments for location, condition, supportive office, or loading docks. However, the court will make a 9% upward adjustment to comparable rental 1 for size, based upon the parameters identified above. The adjusted market rental rate for comparable rental 1 is $8.85. Conversely, the leased area in defendant's comparable rentals 2, 3, and 4 is approximately 4 to 5 times the average size of the rental units in the subject property. Thus, the court does not consider defendant's comparable rentals 2, 3, and 4 accurate evidence of market rent.

The range of market rents of plaintiff's comparable rentals 1 and 3, and defendant's comparable rental 1 is from $8.28 to $8.85, with an average of $8.57. Thus, after consideration of plaintiff's adjusted rental values for comparable rentals 1 and 3, and defendant's adjusted rental

rates for comparable rental 1, and attributing equal weight to the three rentals, the court concludes a market rental rate of $8.50 for the subject property, as of the October 1, 2005 valuation date.

b. October 1, 2008 valuation date

Plaintiff's appraiser's comparable rentals 5 and 6 were entered into approximately 2½ years prior to the October 1, 2008 valuation date. In addition, comparable rental 10 was entered into approximately 4 months after the October 1, 2008 valuation date. Accordingly, the court does not find comparable rentals 5, 6, and 10 accurate evidence of market rent. Plaintiff's comparable rentals 7 and 8 were most similar in size to the average unit size on the subject property. Additionally, comparable rentals 7, 8, and 9 were executed within twelve months of the October 1, 2008 valuation date. Moreover, comparable rental 9 was constructed approximately the same time as the subject property. Thus, the court finds plaintiff's comparable rentals 7, 8, and 9, more accurate evidence of market rents as of the October 1, 2008 valuation date. After adjustments, plaintiff's appraiser concluded an adjusted rental rate of $7.23 for comparable rental 7, an adjusted rental rate of $6.33 for comparable rental 8, and an adjusted rental rate of $7.13 for comparable rental 9.

Defendant's appraiser's comparable rentals 6, 8, 9, and 10 were closest in size to the average unit size, or gross square footage of the subject property. However, for the reasons identified above, the court will make a 2.5% downward adjustment for size to defendant's comparable rental 9, and a 9% upward adjustment for size and 3% downward adjustment for supportive office to defendant's comparable rental 10. The adjusted rental rate for comparable rental 9 is $7.63, and the adjusted rental rate for comparable rental 10 is $9.01. The court observes that comparable rentals 5, 6, and 7 were entered into more than 12 months prior to the October 1, 2008 valuation date. Therefore, the court does not consider comparable rentals 5, 6, and 7 an

24

accurate representation of the market rents as of the October 1, 2008 valuation date. The court finds comparable rentals 8, 9, and 10 more accurate evidence of market rents as of the October 1, 2008 valuation date. The adjusted rental value of comparable rental 8 is $8.40, comparable rental 9 is $7.63, and comparable rental 10 is $9.01.

The range of market rents of plaintiff's comparable rentals 7, 8, and 10 and defendant's comparable rentals 9 and 10 is from $6.33 to $9.01, with an average of $7.62. Thus, giving equal weight to the five comparable rentals, the court concludes a market rental rate of $7.60 as of the October 1, 2008 valuation date.

### c. October 1, 2009 valuation date

Plaintiff's appraiser's comparable rentals 10, 11, 12, and 13 are all substantially similar to the average unit sizes on the subject property. Moreover, the building age of comparable rental 10 is substantially similar to the subject property. In addition, due to the similarities in location, size, physical attributes, and condition, plaintiff's appraiser deemed no adjustments were necessary to comparable rental 10. However, as previously set forth, the court must reject plaintiff's appraiser's 5% downward adjustment for market conditions/time to comparable rentals 10, 11, and 12. Thus, the adjusted rental values are: $7.95 for comparable rental 10; $8.91 for comparable rental 11; and $8.81 for comparable rental 12. As adjusted above, the court finds plaintiff's appraiser's comparable rentals 10, 11, 12, and 13 are more accurate evidence of market rent as of the October 1, 2009 valuation date.

Defendant's appraiser's comparable rentals 11, 12, and 15 are the most similar to either the average unit sizes, or gross square footage of the subject property. Comparable rentals 11, 12, and 14 bear a similar interior ceiling height to the subject property, and required no adjustments for location, condition, supportive office, or loading docks. Conversely, comparable rental 15 bore a

25

ceiling height of only 14 feet, approximately 10 feet below the interior ceiling height of the subject property. As stated above, the court does not find industrial warehouses containing a ceiling height of 14 feet or less to be comparable to, and competitive with the subject property. Therefore, the court does not consider comparable rental 15 credible evidence of market rent. The leased area in comparable rental 13 was approximately 3½ times the average unit size of the subject property, thus the court does not deem comparable rental 13 to be competitive to the subject property. Thus, the court finds defendant's comparable rentals 11, 12, and 14 are more accurate evidence of market rents as of the October 1, 2009 valuation date. However, the court will make a 9% upward adjustment for size to comparable rental 14, for the reasons identified above. The adjusted value of comparable rental 14 is $7.38.

The range of market rents of plaintiff's comparable rentals 10, 11, 12, and 13, and defendant's comparable rentals 11, 12, and 14, is from $6.75 to $8.91, with an average of $8.06. The court places greatest weight on defendant's comparable rental 14, because that rental required only minimal adjustment and was executed approximately 90 days prior to the October 1, 2009 valuation date. Accordingly, the court concludes the court concludes a market rental rate of $7.75 as of the October 1, 2009 valuation date.

d. October 1, 2010 valuation date

Plaintiff's appraiser's comparable rentals 14, 15, and 16 are similar in size to the subject property. However, as stated above, comparable rental 16 was located outside of the Teterboro Airport industrial warehouse sub-market. Without adequate support for the location adjustment, the court must reject plaintiff's appraiser's comparable rental 16. In addition, comparable rental 15 contained an interior ceiling height of only 14 feet. As stated above, the court does not find industrial warehouses containing a ceiling height of 14 feet or less to be comparable to, and

26

competitive with the subject property. Therefore, the court does not consider plaintiff's comparable rental 15 credible evidence of market rent. However, the court finds plaintiff's comparable rental 14 accurate evidence of market rent as of the October 1, 2010 valuation date.

Defendant's appraiser's comparable rentals 15 and 18 are the most similar to the average size of the units in the subject property, or the gross leasable area of the subject property. However, comparable rental 15 was entered into approximately 13 months prior to the October 1, 2010 valuation date. Therefore, the court does not consider comparable rental 15 accurate evidence of market rent. Additionally, the leased area for comparable rental 16 is approximately 4 times larger than the average size of the rental units in the subject property, and the leased area for comparable rental 17 is approximately 6 times larger than the average size of the rental units in the subject property. Accordingly, the court does not consider defendant's comparable rentals 16 and 17 as accurate evidence of market rent. The court finds defendant's comparable rental 18 accurate evidence of market rent as of the October 1, 2010 valuation date. However, the court will make a 9% upward adjustment for size to comparable rental 18. The adjusted rental value for comparable rental 18 is $9.28.

The range of market rents of plaintiff's comparable rental 14, and defendant's comparable rental 18, is from $6.00 to $9.28, with an average of $7.64. Thus, giving equal weight to the foregoing comparable rentals, the court concludes a market rental rate of $7.60 as of the October 1, 2010 valuation date.

### e. October 1, 2013 valuation date

The court observes that plaintiff's appraiser's comparable rentals 17, 18, 19, and 20 are substantially similar in location, physical attributes, and condition to the subject property. However, as stated above, the court will include a 5% upward adjustment for size to plaintiff's

comparable rentals 17, 18, and 20. The adjusted rental values are as follows: $6.14 for comparable rental 17, $5.25 for comparable rental 18, and $6.30 for comparable rental 20. Thus, the court finds plaintiff's comparable rentals 17, 18, 19, and 20, as adjusted, accurate evidence of market rents as of the October 1, 2013 valuation date.

Defendant's appraiser's comparable rentals 20, 21, and 22 were entered into 20 months and 17 months prior to the October 1, 2013 valuation date. Therefore, the court does not find defendant's comparable rentals 20, 21, and 22 are accurate evidence of market rent as of the October 1, 2013 valuation date. Moreover, defendant's appraiser's comparable rental 23 had a leased area approximately 7 times the average area of the units on the subject property. Thus, the court does not deem comparable rental 23 to be comparable to, and competitive with the subject property. Accordingly, the court must reject defendant's comparable rentals 20, 21, 22, and 23 as evidence of market rents as of the October 1, 2013 valuation date.

The range of market rents of plaintiff's comparable rentals 17, 18, 19, and 20, is from $5.25 to $6.78, with an average of $6.12. Thus, giving equal weight to the foregoing comparable rentals, the court concludes a market rental rate of $6.15 for the subject property as of the October 1, 2013 valuation date.

### 3. Cellular communications lease

Both plaintiff's appraiser and defendant's appraiser estimated the income attributable to leasing an area of the roof on the subject property to a cellular communication company at $18,000 annually. The court accepts as reasonable, plaintiff's and defendant's appraisers' estimated annual income stream of $18,000 from the cellular communications equipment.

### 4. Mezzanine area

A fundamental premise of warehouse operation includes the ability to effectively and easily store, move, and access stored merchandise for further transit.

This court finds that the 37,400 square feet of warehouse area in the subject property would be rented to include the approximate 5,000 square feet of unfinished mezzanine. Although copies of the tenant lease agreements for the subject property were not produced at trial, plaintiff's appraiser credibly testified that based on his discussions with brokers directly involved in negotiating the lease terms, the unfinished mezzanine was included in the leased warehouse area for each tenant unit on the subject property. The court finds plaintiff's appraiser's testimony credible, that "no mezzanine is rented independently of the balance of where it's located within. [M]ost times the rentals [of unfinished mezzanine space], its usually thrown in, the rental is based on the ground floor area." No evidence was offered by either plaintiff or defendant that the unfinished mezzanine would be the subject of a separate tenancy, or would require a tenant to pay a separate additional rent. Moreover, the court observes that access to the unfinished mezzanine area is at best, cumbersome. One mezzanine area is accessible only by an open stairway from the warehouse floor. The other mezzanine area affords access via an open stairway, or requires a forklift or hoist to lift product through an elevated opening in the masonry block wall. In the opinion of plaintiff's appraiser, the mezzanine area could only be used for "incidental storage." In plaintiff's appraiser's experience, an unfinished mezzanine area is generally, not ascribed a separate rental value, rather it is included in the lease of the ground floor area.

The court finds plaintiff's appraiser's testimony credible, the mezzanine in the subject property is of little usefulness and value. Because the "mezzanine does not have the same degree of utility" as the balance of the warehouse, the court attributes no separate rental value to the

29

unfinished mezzanine area. See Spiegel v. Town of Harrison, 18 N.J. Tax 416, 423-424 (Tax 1999).

## 5. Vacancy and Collection Loss

Plaintiff's and defendant's appraisers applied a vacancy and collection loss factor to the subject property as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Plaintiff's Appraiser | 6.50% | 7.00%[4] | 8.50% | 8.50% | 8.50% |
| Defendant's Appraiser | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% |

Plaintiff's appraiser relied primarily on his review of CoStar Group, Inc.'s vacancy surveys for the Northern New Jersey industrial warehouse market, Meadowlands industrial warehouse market, and Teterboro Airport industrial warehouse submarket. The CoStar report identified vacancy rates between 2006 and 2013 of: (i) between 407 to 447 buildings within the Teterboro Airport industrial submarket; and (ii) 1,422 to 1,606 buildings within the Meadowlands industrial warehouse market. Plaintiff's appraiser's review and analysis of that data disclosed vacancy rates ranging from 6.1%, in the 3rd quarter 2006, to 8.8%, in the 3rd quarter 2013.

Conversely, defendant's appraiser relied on vacancy data collected by his appraisal firm between 2006 and 2012 on 64 industrial properties in Moonachie, New Jersey. Defendant's appraiser assembled such information into a spreadsheet contained in an addendum to his appraisal report.

The court finds plaintiff's appraiser presented a more comprehensive view of the Northern New Jersey and Meadowlands industrial warehouse markets, and the Teterboro Airport industrial

---

[4] Plaintiff's appraiser's appraisal report, page 25, stated a vacancy and collection loss factor of 7.50% should be applied for the 2009 tax year. However, in computing the subject property's Effective Gross Income for the 2009 tax year plaintiff's appraiser applied a vacancy and collection loss factor of 7.00%.

warehouse submarket. Therefore, the court accepts plaintiff's vacancy and collection loss data as more comprehensive and credible. Accordingly, the court will apply the following vacancy and collection loss factor to the subject property:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Vacancy and collection loss factor | 6.00% | 7.00% | 8.50% | 8.50% | 6.00% |

6. Operating Expenses

In a net lease, the landlord is fully reimbursed for the real estate taxes and operating expenses attributed to the area of the improvement subject to the net lease. Thus, under a net lease, the landlord is responsible only "for structural maintenance, building reserves, and management." The Dictionary of Real Estate Appraisal, supra, at 134. Accordingly, there are very few expenses attributable to the landlord, unlike a gross lease where the landlord is responsible for the real estate taxes and "all of the property's operating and fixed expenses." The Dictionary of Real Estate Appraisal, supra, at 91.

For all tax years involved herein, plaintiff's and defendant's appraisers both included a management fee expense of 5% of Effective Gross Income. The court accepts a management fee expense of 5% of Effective Gross Income as reasonable.

Plaintiff's appraiser applied leasing commission expenses of 5% of Effective Gross Income; miscellaneous fee expenses of 2%; and reserves for replacements of $0.50 per square foot. Conversely, defendant's appraiser applied leasing commission expenses of 3% of Effective Gross Income and reserves for replacements of $0.25 per square foot

In plaintiff's appraiser's opinion and experience, leasing commission expenses of 5% are customary in the marketplace. In fact, plaintiff's appraiser credibly testified that a real estate broker was involved in each of the twenty comparable rentals relied upon by plaintiff's appraiser. Therefore, he applied a leasing commission expense of 5% of the Effective Gross Income for each

31

tax year. Conversely, defendant's appraiser expressed that leasing commissions in the marketplace were 3% to 5% of the Effective Gross Income. In defendant's appraiser's opinion, property owners will "negate the cost by leasing the facility themselves." Therefore, defendant's appraiser concluded a leasing commission expense of 3% of the Effective Gross Income. However, defendant's appraiser offered no evidence that either the subject property, nor any of the twenty-three comparable rentals relied on by defendant's appraiser avoided payment of a leasing commission expense by leasing the facility themselves.

Thus, the court finds plaintiff's appraiser's testimony on this issue to be more credible. Therefore, the court accepts plaintiff's appraiser's leasing commission expense of 5% of Effective Gross Income.

Next, plaintiff's appraiser applied a miscellaneous expense of 2% to the subject property's Effective Gross Income. Defendant's appraiser did not apply any miscellaneous expense to the Effective Gross Income of the subject property. However, plaintiff's appraiser's testimony offered only unsupported and conjectural observations justifying such an expense. Moreover, no support for plaintiff's appraiser's miscellaneous expense was included in his appraisal report. Therefore, the court rejects plaintiff's appraiser's miscellaneous expense of 2% of the subject property's Effective Gross Income.

Finally, plaintiff's appraiser applied a reserve for replacements of $0.50 per square foot, which he applied to his initial calculation of 37,000 square feet of the ground floor of the subject property. Conversely, defendant's appraiser employed a reserve for replacements of $0.25 per square foot, which he applied to his initial calculation of 42,775 square feet of the subject property, inclusive of the mezzanine. In defendant's appraiser's opinion, the reserve for replacements should be applied to replace all of the building components, not simply the exterior footprint.

32

However, plaintiff's appraiser's report did not contain any support for his replacement reserve calculation. Instead, during direct examination, plaintiff's appraiser offered testimony that his replacement reserve calculation was based on his review of the Marshall & Swift manual cost tables, contained in his work file, and a copy of those cost tables were identified and admitted into evidence.

The court concludes that defendant's appraiser's replacement reserve calculation of $0.25 per square foot, and application of the replacement reserve to all of the components of the building on the subject property is supported by credible data and analysis, and is more reasonable. Therefore, the court will apply the $0.25 per square foot replacement reserve calculation to the 37,400 square foot ground floor area and 5,000 square foot mezzanine area.

### 7. Capitalization

Direct capitalization is a "method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, supra, at 491. Thus, the capitalization rate is the device that converts net operating income into an estimate of property value.

Here, in deriving their overall capitalization rates, both plaintiff's and defendant's appraisers consulted a variety of investor surveys and employed the Band of Investment technique. The investor surveys are completed by market participants engaged in real estate financing transactions during given time periods. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value

indication.' The technique includes both a mortgage and an equity component." <u>Hull Junction Holding</u>, <u>supra</u>, 16 <u>N.J. Tax.</u> at 80-81 (quoting Appraisal Institute, <u>Appraisal of Real Estate</u>, 467 (10th ed 1992)). In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" <u>Id.</u> at 82 (quoting <u>Glen Wall Assocs. v. Township of Wall</u>, 99 <u>N.J.</u> 265, 279-80 (1985)).

In arriving at his capitalization rates, plaintiff's appraiser consulted the Korpacz/PWC National Warehouse Market surveys, Korpacz/PWC National Flex/R&D surveys. However, plaintiff's appraiser "put the most emphasis" on the RERC Second-Tier Investment Properties for Industrial Warehouse and R&D properties for the 3rd quarter 2005, 3rd quarter 2008, 3rd quarter 2009, 3rd quarter 2010, and 3rd quarter 2013.

Similarly, in arriving at his capitalization rates, defendant's appraiser reviewed the Korpacz/PWC National Warehouse Market surveys for the 4th quarter 2005, 3rd quarter 2008, 3rd quarter 2009, 3rd quarter 2010, and 3rd quarter 2013. Defendant's appraiser also reviewed and considered American Council of Life Insurers ("ACLI") Investment Bulletins – Industrial Property for the 3rd quarter 2005, 3rd quarter 2008, 3rd quarter 2009, 3rd quarter 2010, and 3rd quarter 2013.

Plaintiff's appraiser and defendant's appraiser also both consulted the ACLI Commercial Mortgage Commitments for the 3rd quarter 2005, 3rd quarter 2008, 3rd quarter 2009, 3rd quarter 2010, and 3rd quarter 2013, to gauge the market contract interest rates and loan-to-value ratios.

For the 2006 tax year, plaintiff's appraiser assumed: (i) a 5.14% interest rate for the mortgage component; (ii) a 69.7% loan-to-value ratio; and (iii) a 7.00% equity dividend rate. The resulting overall capitalization rate for the 2006 tax year is: 7.35%. Defendant's appraiser

assumed: (i) a 5.35% interest rate for the mortgage component; (ii) a 25-year mortgage amortization period; (iii) a 65% loan-to-value ratio; and (iv) a 8% equity dividend rate. The resulting overall capitalization rate for the 2006 tax year is: 7.50%.

For the 2009 tax year, plaintiff's appraiser assumed: (i) a 6.43% interest rate for the mortgage component; (ii) a 62.30% loan-to-value ratio; and (iii) a 8.50% equity dividend rate. The resulting overall capitalization rate for the 2009 tax year is: 8.31%. Defendant's appraiser assumed: (i) a 6.50% interest rate for the mortgage component; (ii) a 25-year mortgage amortization period; (iii) a 65% loan-to-value ratio; and (iv) a 6.50% equity dividend rate. The resulting overall capitalization rate for the 2009 tax year is: 7.55%.

For the 2010 tax year, plaintiff's appraiser assumed: (i) a 7.27% interest rate for the mortgage component; (ii) a 60.10% loan-to-value ratio; and (iii) a 9.00% equity dividend rate. The resulting overall capitalization rate for the 2010 tax year is: 9.06%. Defendant's appraiser assumed: (i) a 7.00% interest rate for the mortgage component; (ii) a 25-year mortgage amortization period; (iii) a 65% loan-to-value ratio; and (iv) a 7.00% equity dividend rate. The resulting overall capitalization rate for the 2010 tax year is: 8.00%.

For the 2011 tax year, plaintiff's appraiser assumed: (i) a 5.11% interest rate for the mortgage component; (ii) a 65.20% loan-to-value ratio; and (iii) a 7.00% equity dividend rate. The resulting overall capitalization rate for the 2011 tax year is: 7.07%. Defendant's appraiser assumed: (i) a 5.50% interest rate for the mortgage component; (ii) a 25-year mortgage amortization period; (iii) a 65% loan-to-value ratio; and (iv) a 9.00% equity dividend rate. The resulting overall capitalization rate for the 2010 tax year is: 7.95%.

For the 2014 tax year, plaintiff's appraiser assumed: (i) a 3.87% interest rate for the mortgage component; (ii) a 61.84% loan-to-value ratio; and (iii) a 6.00% equity dividend rate. The

resulting overall capitalization rate for the 2010 tax year is: 6.95%. Defendant's appraiser assumed: (i) a 4.00% interest rate for the mortgage component; (ii) a 25-year mortgage amortization period; (iii) a 65% loan-to-value ratio; and (iv) a 8.50% equity dividend rate. The resulting overall capitalization rate for the 2014 tax year is: 7.10%.

"[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., supra, 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

The court considered the testimony of plaintiff's appraiser and defendant's appraiser and has reviewed and analyzed the supporting surveys, tables of information and mortgage/equity calculations and finds that the following capitalization rates should apply to the subject property:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Capitalization Rate | 7.50% | 7.55% | 8.00% | 7.95% | 7.10% |

For the reasons set forth above, the court finds the true value of the subject property under the income-capitalization approach to be: $3,745,067, as of October 1, 2005; $3,300,079, as of October 1, 2008; $3,124,450, as of October 1, 2009; $3,084,704, as of October 1, 2010; and $2,885,554, as of October 1, 2013.

**2006 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Warehouse | $8.50 (Net) | @ 37,400 sq. ft. | $ 317,900 |

| | | | |
|---|---|---|---|
| TOTAL:POTENTIAL GROSS INCOME | | | $ 317,900 |
| LESS:   Vacancy & Collection Loss | | @ 6.00% | ($   19,074) |
| PLUS:   Cellular Communications Income | | | $   18,000 |
| TOTAL: EFFECTIVE GROSS INCOME | | | $ 316,826 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $  15,841 | |
| Leasing Commissions | @ 3% of EGI | $    9,505 | |
| Replacement Reserves | @ $0.25 psf x 42,400 sq ft | $  10,600 | |
| TOTAL: EXPENSES | | | ($     35,946) |

| | |
|---|---|
| NET OPERATING INCOME | $   280,880 |
| CAPITALIZATION RATE          7.50% | |
| INDICATED VALUE | $3,745,067 |

**2009 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Warehouse | $7.60 (Net) | @ 37,400 sq. ft. | $ 284,240 |

| | | | |
|---|---|---|---|
| TOTAL:POTENTIAL GROSS INCOME | | | $ 284,240 |
| LESS:   Vacancy & Collection Loss | | @ 7.00% | ($   19,897) |
| PLUS:   Cellular Communications Income | | | $   18,000 |
| TOTAL: EFFECTIVE GROSS INCOME | | | $ 282,343 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $  14,117 | |
| Leasing Commissions | @ 3% of EGI | $    8,470 | |
| Replacement Reserves | @ $0.25 psf x 42,400 sq ft | $  10,600 | |
| TOTAL: EXPENSES | | | ($     33,187) |

| | |
|---|---|
| NET OPERATING INCOME | $   249,156 |
| CAPITALIZATION RATE          7.55% | |
| INDICATED VALUE | $3,300,079 |

**2010 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Warehouse | $7.75 (Net) | @ 37,400 sq. ft. | $ 289,850 |

| | | |
|---|---|---|
| TOTAL: POTENTIAL GROSS INCOME | | $ 289,850 |
| LESS: Vacancy & Collection Loss | @ 8.50% | ($ 24,637) |
| PLUS: Cellular Communications Income | | $ 18,000 |
| TOTAL: EFFECTIVE GROSS INCOME | | $ 283,213 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $ 14,161 | |
| Leasing Commissions | @ 3% of EGI | $ 8,496 | |
| Replacement Reserves | @ $0.25 psf x 42,400 sq ft | $ 10,600 | |
| TOTAL: EXPENSES | | | ($ 33,257) |

| | |
|---|---|
| NET OPERATING INCOME | $ 249,956 |

| | | |
|---|---|---|
| CAPITALIZATION RATE | 8.00% | |

| | |
|---|---|
| INDICATED VALUE | $3,124,450 |

**2011 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Warehouse | $7.60 (Net) | @ 37,400 sq. ft. | $ 284,240 |

| | | |
|---|---|---|
| TOTAL: POTENTIAL GROSS INCOME | | $ 284,240 |
| LESS: Vacancy & Collection Loss | @ 8.50% | ($ 24,160) |
| PLUS: Cellular Communications Income | | $ 18,000 |
| TOTAL: EFFECTIVE GROSS INCOME | | $ 278,080 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $ 13,904 | |
| Leasing Commissions | @ 3% of EGI | $ 8,342 | |
| Replacement Reserves | @ $0.25 psf x 42,400 sq ft | $ 10,600 | |
| TOTAL: EXPENSES | | | ($ 32,846) |

| | |
|---|---|
| NET OPERATING INCOME | $ 245,234 |

| | | |
|---|---|---|
| CAPITALIZATION RATE | 7.95% | |

| | |
|---|---|
| INDICATED VALUE | $3,084,704 |

**2014 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Warehouse | $6.15 (Net) | @ 37,400 sq. ft. | $ 230,010 |

| | | | |
|---|---|---|---|
| TOTAL: POTENTIAL GROSS INCOME | | | $ 230,010 |
| LESS: Vacancy & Collection Loss | | @ 6.00% | ($ 13,801) |
| PLUS: Cellular Communications Income | | | $ 18,000 |
| TOTAL: EFFECTIVE GROSS INCOME | | | $ 234,209 |

EXPENSES:

| | | | |
|---|---|---|---|
| Management | @ 5% of EGI | $ 11,710 | |
| Leasing Commissions | @ 3% of EGI | $ 7,026 | |
| Replacement Reserves | @ $0.25 psf x 42,400 sq ft | $ 10,600 | |
| TOTAL: EXPENSES | | | ($ 29,336) |

| | |
|---|---|
| NET OPERATING INCOME | $ 204,873 |

| | | |
|---|---|---|
| CAPITALIZATION RATE | 7.10% | |

| | |
|---|---|
| INDICATED VALUE | $2,885,554 |

2. Sales Comparison Approach

The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value…which may include variations in property rights, financing, terms, market conditions and physical characteristics." Appraisal Institute, The Appraisal of Real Estate, supra, at 378. "When data is available, this [approach] is the most straightforward and simple way to explain and support an opinion of market value." Greenblatt, supra, 26 N.J. Tax at 53 (citing Appraisal Institute, The Appraisal of Real Estate 300 (13th ed. 2008)). A "major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." Appraisal Institute, The Appraisal of Real Estate, 377 (14th ed. 2013). Thus, the usefulness of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions.

In engaging in a sales comparison approach, a substantial similarity must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b. 4 N.J. Tax 528 (App. Div. 1981). By definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Township, 9 N.J. Tax 66, 72 (Tax 1987). Thus, a fundamental predicate of the comparative approach requires evidence "be based on 'sound theory and objective data', rather than on mere wishful thinking." MSGW Real Estate Fund, supra, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y. 2d 179, 188 (1998)). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, supra, at 390. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn and the objective market data utilized to support any adjustments thereto.

a. Plaintiff's appraiser's analysis

Plaintiff's appraiser identified the sale of 19 industrial warehouses he deemed comparable to the subject property. All of his comparable sale transactions were located within Bergen County, New Jersey.

Plaintiff's appraiser applied a series of upward and downward adjustments to the sale transactions: location (ranging from 0% to 5%); size (ranging from 0% to 15%); physical attributes (ranging from 0% to 5%); and age/physical condition (ranging from 5% to 15%). Plaintiff's

40

appraiser made location adjustments to comparable sales 2 and 6, to account for their location outside the Meadowlands industrial warehouse submarket. Plaintiff's appraiser made size adjustments to comparable sales 3, 4, 5, 6, 7, and 8, to account for the inverse relationship of building area to unit value (i.e., the larger the building the lower the unit price). He applied physical attribute adjustments to comparable sales 1, 2, 3, 4, 6, 7, 8, 11, 12, 13, 14, 15, 18, and 19 to account for their lower ceiling heights than the subject property. The age/physical condition adjustments applied by plaintiff's appraiser to all 19 comparable sales were intended to reflect their perceived inferiority in age and condition to the subject property. The range, per square foot, of unadjusted prices and adjusted prices for the 19 comparable sales are set forth as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Unadjusted Prices PSF | $57.48 - $60.71 | $55.00 - $84.64 | $71.97 - $78.26 | $58.00 - $75.00 | $59.40 - $91.95 |
| Adjusted Prices PSF | $64.66 - $71.34 | $60.50 - $89.52 | $77.37 - $82.50 | $63.80 - $82.50 | $65.34 - $96.55 |

Based on the foregoing analysis, plaintiff's appraiser concluded a value, per square foot, for the ground floor of the warehouse as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market value | $68.00 | $82.00 | $80.00 | $72.00 | $80.00 |

In addition, plaintiff's appraiser concluded a value, per square foot, for the unfinished mezzanine area as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market value | $34.00 | $41.00 | $40.00 | $36.00 | $40.00 |

Plaintiff's appraiser computed the value for the unfinished mezzanine area by multiplying his concluded value for the ground floor of the warehouse by 50%.

b.  Defendant's appraiser's analysis

Defendant's appraiser identified the sale of 22 industrial warehouses he deemed comparable to the subject property.  All of the comparable sales transactions, excluding comparable sale 3, were located within the Teterboro Airport industrial warehouse submarket.

Defendant's appraiser applied a series of upward and downward adjustments to the sale transactions: location (ranging from 0% to 5%); size (ranging from 0% to 7.5%); physical condition (ranging from 0% to 5%); ceiling height (ranging from 0% to 5%); supportive office area (ranging from 0% to 7.5%); and land to building ratio (ranging from 0% to 10%).  The 5% upward adjustment for location to comparable sale 3 was made to account for its proximity outside the Meadowlands industrial warehouse submarket.  The 7.5% upward adjustment for size to comparable sale 22 was made to account for the size difference, approximately 4 times larger than the subject property.  The 5% downward adjustment for physical condition to comparable sale 10, was made to account for its newly renovated condition.  The 5% upward adjustment for ceiling height to comparable sales 1, 2, 3, 4, 6, 7, 8, 12, 13, 15, 17, and 19 were made to account for the fact that they all contained interior warehouse ceiling heights between only 14 feet to 18 feet.  The 7.5% downward adjustment for supportive office to comparable sales 1, 5, 16, and 22 was intended to account for the perceived superior office area accorded those warehouses.  Finally, the 10% downward land to building ratio adjustment to comparable sales 1, 3, 5, 8, 10, and 11 was made to account for the greater land to building ratios afforded those properties.  The range, per square foot, of unadjusted prices and adjusted prices for the 22 comparable sales are set forth as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Unadjusted Prices PSF | $90.59 - $115.00 | $79.24 - $118.16 | $77.60 - $107.50 | $75.00 - $111.33 | $76.45 - $104.59 |
| Adjusted Prices PSF | $90.59 - $98.87 | $79.90 - $112.25 | $69.84 - $97.22 | $78.75 - $102.98 | $76.45 - $104.59 |

Based on the foregoing analysis, defendant's appraiser concluded a value, per square foot, for the ground floor and mezzanine area of the warehouse as follows:

| Tax Year | 2006 | 2009 | 2010 | 2011 | 2014 |
|---|---|---|---|---|---|
| Market value | $95.00 | $90.00 | $85.00 | $90.00 | $90.00 |

c. Conclusion

An individual possessing particular knowledge, skill, experience, training or education, may be qualified by the court, under N.J.R.E. 702, as an expert and therefore permitted to render opinion testimony. Rosenberg v. Tavorath, 352 N.J. Super. 385 (App. Div. 2002). Although the facts or data relied upon by an expert need not be admissible, the expert's testimony must be rooted in facts, science, data or the opinions of other experts. N.J.R.E. 703. Thus, "[t]he rule requires an expert 'to give the why and wherefore' of his or her opinion, rather than a mere conclusion." Rosenberg, supra, 352 N.J. Super. at 401 (quoting Jimenez v. GNOC, Corp., supra, 286 N.J. Super. at 540). When the opinion of an expert is offered "[w]ithout explanation as to the basis, the opinion of the expert is entitled to little weight. . ." Dworman, supra, 1 N.J. Tax at 458. The value, significance and "probative utility of an expert's opinion stands or falls on the facts and reasoning offered in its support." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 284 (App. Div. 1998). Similarly, the weight accorded expert testimony relative to comparative adjustments "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980) (citing Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

At the outset, the court highlights that plaintiff's appraiser's comparable sales 2 and 6 contain interior warehouse ceiling heights of less than 15 feet. Additionally, defendant's appraiser's comparable sales 2, 3, 6, and 8 contain interior warehouse ceiling heights less than 15

feet. As stated at length above, neither plaintiff's appraiser, nor defendant's appraiser presented any surveys or market data demonstrating that an industrial warehouse containing a ceiling height of only 12 feet will lease or sell for 5% less than a comparable and competitive industrial warehouse containing a ceiling height of 22 feet.

Nonetheless the court acknowledges, that both plaintiff's and defendant's appraisers' concluded that a 5% upward adjustment is warranted to industrial warehouses containing a ceiling height less than 20 feet. Thus, the court will accept plaintiff's and defendant's appraisers 5% upward ceiling height adjustment, for each comparable warehouse sale containing a ceiling height between 15 to 19 feet. However, the court does not accept as comparable to, and competitive with the subject property, any industrial warehouse sale containing a ceiling height of 14 feet or less. Accordingly, the court must reject plaintiff's appraiser's comparable sales 2 and 6, and defendant's appraiser's comparable sales 2, 3, 6, and 8, as not accurate evidence of market value as of the valuation dates.

In addition, the court finds that defendant's appraiser did not present the court with credible market evidence or data to substantiate his supportive office adjustments to comparable sales 1, 5, 16, and 22. The court observes that, in general, defendant's appraiser's comparable sales contained supportive office space ranging between 5% to 18%. However, defendant's appraiser failed to offer any data or credible market evidence disclosing that a 7.5% downward supportive office adjustment is justified for a warehouse with 20% supportive office (comparable sale 5), yet no downward supportive adjustment is warranted for a warehouse with 18% supportive office (comparable sale 9). Moreover, defendant's appraiser failed to offer a satisfactory explanation why the identical 7.5% downward adjustment is warranted for a warehouse possessing 75% supportive office (comparable sale 1), as a warehouse that possesses only 20% supportive office

(comparable sale 5). Defendant's appraiser offered no data or evidence revealing that a warehouse with supportive office of 20% will sell for 7.5% more than a similarly situated and competitively priced warehouse having supportive office of 18%. Thus, for the foregoing reasons, the court rejects defendant's comparable sales 1, 5, 16, and 22 as accurate evidence of true market value.

### October 1, 2005 valuation date

As a result of plaintiff's and defendant's appraisers' failure to adequately support their adjustment for industrial warehouses containing an interior ceiling height less than 15 feet, the court rejects plaintiff's comparable sale 2, and defendant's comparable sales 2 and 3. Moreover, the failure to provide adequate market support for his adjustment for supportive office results in the exclusion of defendant's appraiser's comparable sale 1.

Additionally, conflicting testimony and evidence was presented during trial regarding the date of plaintiff's comparable sale 1. Plaintiff's appraiser's appraisal report and testimony initially disclosed an April 13, 2005 sale date. However, during cross-examination plaintiff's appraiser acknowledged that comparable sale 1 may have sold in 2009, and not in 2005. Had comparable sale 1 sold in 2009, then it would not be credible evidence of the market value of the subject property as of the October 1, 2005 valuation date. However, as neither party presented credible evidence confirming the date of plaintiff's comparable sale 1, the court is left without adequate credible evidence in the record, and therefore, must reject it as evidence of market value. As such, the court has not been presented with any credible comparable sales data from which it can discern the true market value of the subject property under the sales comparison approach as of the October 1, 2005 valuation date.

<u>October 1, 2008 valuation date</u>

As a result of plaintiff's and defendant's appraisers' failure to adequately support their adjustment for industrial warehouses containing an interior ceiling height less than 15 feet, the court rejects plaintiff's comparable sale 6, and defendant's comparable sales 6 and 8.

The court finds plaintiff's appraiser's adjustments to comparable sales 3, 4, 5, 7, and 8 reasonable. The court further concludes that defendant's appraiser's adjustments to comparable sales 4, 5, 7, and 9 are reasonable. The range of value of these nine comparable sales is $75.00 to $89.52 per square foot, with an average of $84.64 per square foot. Thus, the court accepts a value of $85.00 [rounded] per square foot for the subject property, as of the October 1, 2008 valuation date. Correspondingly, the court multiplies the concluded value, $85.00 per square foot, by the 37,400 square feet of the ground floor of the subject property, to determine a value under the sales comparison approach of $3,179,000 (37,400 x $85.00 = $3,179,000).

<u>October 1, 2009 valuation date</u>

The court finds plaintiff's appraiser's adjustments to comparable sales 9, 10, and 11 reasonable. The court further finds defendant's appraiser's adjustments to comparable sales 9, 10, 11, and 12 reasonable. The range of value of these seven comparable sales is from $69.84 to $97.22 per square foot, with an average of $82.91 per square foot. Thus, the court accepts a value of $83.00 [rounded] per square foot for the subject property, as of the October 1, 2009 valuation date. Correspondingly, the court multiplies the concluded value, $83.00 per square foot, by the 37,400 square feet of the first floor of the subject property, to determine a value under the sales comparison approach of $3,104,200 (37,400 x $83.00 = $3,104,200).

<u>October 1, 2010 valuation date</u>

The court finds plaintiff's appraiser's adjustments to comparable sales 12, 13, 14, and 15 reasonable. The court further finds defendant's appraiser's adjustments to comparable sales 13, 14, 15, and 17 reasonable. However, defendant's appraiser's failure to provide adequate market support for his supportive office adjustment, results in the exclusion of defendant's appraiser's comparable sale 16. The range of value of these eight comparable sales is from $63.80 to $99.53 per square foot, with an average of $80.27 per square foot. Thus, the court accepts a value of $80.00 [rounded] per square foot for the subject property, as of the October 1, 2010 valuation date. Correspondingly, the court multiplies the concluded value, $80.00 per square foot, by the 37,400 square feet of the first floor of the subject property, to determine a value under the sales comparison approach of $2,992,000 (37,400 x $80.00 = $2,992,000).

<u>October 1, 2013 valuation date</u>

The court finds plaintiff's appraiser's adjustments to comparable sales 16, 17, 18, and 19 reasonable. The court further concludes that defendant's appraiser's adjustments to comparable sales 19, 20, and 21 are reasonable. However, defendant's appraiser's failure to provide adequate market support for his supportive office adjustment, results in the exclusion of defendant's appraiser's comparable sale 22. The range of value of these seven comparable sales is from $65.34 to $104.59 per square foot, with an average of $83.92 per square foot. Thus, the court accepts a value of $84.00 [rounded] per square foot for the subject property, as of the October 1, 2013 valuation date. Correspondingly, the court multiplies the concluded value, $84.00 per square foot, by the 37,400 square feet of the first floor of the subject property, to determine a value under the sales comparison approach of $3,141,600 (37,400 x $84.00 = $3,141,600).

3.  Reconciliation

In reconciling the concluded values under the income capitalization and sales comparison approaches to value, the court recognizes that both plaintiff's appraiser and defendant's appraiser placed the greatest degree of weight on the income capitalization approach, as the subject property was income-producing as of each valuation date.

Similarly, the court places the greatest degree of weight on the income capitalization approach to value, and concludes a true market value of the subject property as follows:

| Valuation Date | 10/1/2005 | 10/1/2008 | 10/1/2009 | 10/1/2010 | 10/1/2013 |
|---|---|---|---|---|---|
| Concluded Value | $3,745,000 | $3,276,000 | $3,120,000 | $3,066,000 | $2,937,000 |

Having reached a conclusion of the true market value of the subject property, the court will determine the correct assessment for the 2006, 2009, 2010, 2011, and 2014 tax years.  Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property...." N.J.S.A. 54:51A-6(a).  This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).  When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value     x     Average ratio  =     Revised taxable value

For the 2006 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.00 and lower limit of .9648.  The ratio of total assessed value, $4,048,900, to true market value, $3,745,000, yields a ratio of 1.08%, which exceeds the applied upper limit.  Consequently, the calculation for the 2006 tax year is:

$$\$3,745,000 \quad \text{x} \quad 1.00^5 \quad = \quad \$3,745,000$$

Accordingly, a judgment establishing the subject property's tax assessment for the 2006 tax year will be entered as follows:

| | |
|---|---|
| Land | $1,200,000 |
| Improvement | $2,545,000 |
| Total | $3,745,000 |

For the 2009 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.00 and lower limit of .7817. The ratio of total assessed value, $4,048,900, to true market value, $3,276,000, yields a ratio of 1.24%, which exceeds the applied upper limit. Consequently, the calculation for the 2009 tax year is:

$$\$3,276,000 \quad \text{x} \quad .9196 \quad = \quad \$3,012,600 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the subject property's tax assessment for the 2009 tax year will be entered as follows:

| | |
|---|---|
| Land | $1,200,000 |
| Improvement | $1,812,600 |
| Total | $3,012,600 |

For the 2010 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.00 and lower limit of .8256. The ratio of total assessed value, $4,048,900, to true market value, $3,120,000, yields a ratio of 1.30%, which exceeds the applied upper limit. Consequently, the calculation for the 2010 tax year is:

$$\$3,120,000 \quad \text{x} \quad .9713 \quad = \quad \$3,030,500 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the subject property's tax assessment for the 2010 tax year will be entered as follows:

---

[5] If both the average ratio and the ratio of assessed value to true value exceed the county percentage level, or 100% (M.I. Holdings, Inc. v. Jersey City, 12 N.J. Tax 129, 145 (Tax 1991)), the tax court shall enter judgment revising the taxable value by applying the county percentage level to the true value of the property. N.J.S.A. 54:51A-6(c).

|             |              |
|-------------|--------------|
| Land        | $1,200,000   |
| Improvement | $1,830,500   |
| Total       | $3,030,500   |

For the 2011 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.00 and lower limit of .7761. The ratio of total assessed value, $4,048,900, to true market value, $3,066,000, yields a ratio of 1.32%, which exceeds the upper limit. Consequently, the calculation for the 2011 tax year is:

$3,066,000     x     .9131% =     $2,800,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's tax assessment for the 2011 tax year will be entered as follows:

|             |              |
|-------------|--------------|
| Land        | $1,200,000   |
| Improvement | $1,600,000   |
| Total       | $2,800,000   |

For the 2014 tax year, application of the Chapter 123 ratio results in an applied upper limit of 1.00 and lower limit of .8375. The ratio of total assessed value, $4,048,900, to true market value, $2,937,000, yields a ratio of 1.38%, which exceeds the upper limit. Consequently, the calculation for the 2014 tax year is:

$2,937,000     x     .9853% =     $2,894,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's tax assessment for the 2014 tax year will be entered as follows:

|             |              |
|-------------|--------------|
| Land        | $1,200,000   |
| Improvement | $1,694,000   |
| Total       | $2,894,000   |

The court will enter judgments reflecting the foregoing.

Very truly yours,


/s/Hon. Joshua D. Novin, J.T.C.